# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

| | |
|---|---|
| UNITED STATES AND THE STATE OF FLORIDA *EX REL.* [SEALED], <br><br> Plaintiffs, <br><br> vs. <br><br> [SEALED], <br><br> Defendants. | CASE NO.5:22-CV-00238-JA-PRL <br><br> **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §3730(B)(2), AND THE FLORIDA FALSE CLAIMS ACT, FLA. STAT. §68.081, *ET SEQ.*** <br><br> **DEMAND FOR JURY TRIAL** |

**FIRST AMENDED COMPLAINT FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §3729, *ET SEQ.*, AND THE FLORIDA FALSE CLAIMS ACT, FLA. STAT. §68.081, *ET SEQ.*[1]**

**SEALED CONFIDENTIAL DOCUMENT PREPARED PURSUANT TO FLA. STAT. §68.082, EXEMPT FROM DISCLOSURE PURSUANT TO FLA. STAT. §119.07(1) AND §24(A), ART. I, OF THE STATE CONSTITUTION AND FLA. STAT. §68.083(8).  MAY ALSO CONTAIN HIPAA AND OTHER PROTECTED INFORMATION.**

FILED - USDC - FLMD - OCA
AUG 27 2025 AM10:40

---

[1] Relators previously filed and served this First Amended Complaint on July 14, 2025.  Relators now refile the First Amended Complaint to correct an error with the signature block.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

| | |
|---|---|
| UNITED STATES AND THE STATE OF FLORIDA, *EX REL.* WHITNEY TRELOAR, DARREN CARUSO, JEANNETTE SKINNER, and JOEL SNOOK,<br><br>            Plaintiffs,<br><br>vs.<br><br>OGLETHORPE, INC., WILLOUGH HEALTHCARE, INC. D/B/A THE WILLOUGH AT NAPLES, OGLETHORPE OF ORLANDO, INC. D/B/A THE BLACKBERRY CENTER, OGLETHORPE OF PORT ST. LUCIE, LLC D/B/A PORT ST. LUCIE HOSPITAL, SPRINGBROOK ANNEX, LLC D/B/A SPRINGBROOK HOSPITAL, OGLETHORPE OF ST. CLOUD, LLC D/B/A HEROES' MILE, ROBERT COHEN, JOHN PICCIANO, and JAMES O'SHEA,<br><br>            Defendants. | CASE NO. 5:22-CV-00238-JA-PRL<br><br>FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §3730(B)(2) AND THE FLORIDA FALSE CLAIMS ACT, FLA. STAT §68.081, *ET SEQ.*<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT FILED *IN CAMERA* AND
UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT,
31 U.S.C. §3729, *ET SEQ.*, AND THE FLORIDA FALSE
CLAIMS ACT, FLA. STAT. §68.081, *ET SEQ.*

SEALED CONFIDENTIAL DOCUMENT PREPARED PURSUANT
TO FLA. STAT. §68.082, EXEMPT FROM DISCLOSURE PURSUANT
TO FLA. STAT. §119.07(1) AND §24(A), ART. I, OF THE STATE
CONSTITUTION AND FLA. STAT. §68.083(8). MAY ALSO CONTAIN
HIPAA AND OTHER PROTECTED INFORMATION.

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   JURISDICTION AND VENUE ................................................................ 4

III.  PARTIES ................................................................................................... 5

IV.   LEGAL BASIS OF THE ACTION .......................................................... 12

      A.    The FCA And The Florida FCA ................................................... 12

      B.    Medicare Laws And Regulations ................................................ 14

      C.    Medicare Payment For Inpatient Psychiatric Facility Treatment
            Services .......................................................................................... 17

      D.    The Florida Medicaid Program ................................................... 21

V.    ALLEGATIONS OF DEFENDANTS' WRONGDOING ........................ 23

VI.   DEFENDANTS KNOWINGLY PRESENT FALSE CLAIMS ............... 27

      A.    Defendants Knowingly Submit False Claims To Medicare And
            Medicaid, Fabricate Medical Records For Audits, And Instruct
            Employees To Falsify Certifications ........................................... 27

      B.    Defendants Pay Kickbacks To Obtain Medicare And Medicaid
            Patients Willing To Be Voluntarily Admitted For Inpatient
            Treatment Services ...................................................................... 40

      C.    Defendants Knowingly Provide Worthless Services, Fail To
            Maintain Medical Records, And Instruct Employees To Falsify
            Medical Records ............................................................................ 51

            1.    Management Direct Staff To Fabricate Medical
                  Documentation .................................................................... 55

      D.    Defendants Knowingly Bill Medicare And Medicaid For Patients
            Admitted And Retained Without The Medical Necessity To
            Justify Their Treatment ............................................................... 60

      E.    Oglethorpe Knowingly Violates The Terms Of Its CIA And
            Knowingly Fails To Repay Money Owed To The United States ............ 63

i

VII.   DAMAGES CAUSED BY DEFENDANTS' FALSE CLAIMS ............................ 65

VIII.  COUNTS.......................................................................................... 65

IX.    PRAYER FOR RELIEF ................................................................... 69

X.     DEMAND FOR JURY TRIAL............................................................ 70

## I.   INTRODUCTION

1.     Plaintiff-relators Whitney Treloar ("Relator Treloar"), Darren Caruso ("Relator Caruso"), Jeannette Skinner ("Relator Skinner"), and Joel Snook ("Relator Snook")  (collectively, "Relators"), by and through their undersigned counsel, bring this action on behalf of the United States of America ("United States") and the State of Florida ("Florida") against defendant Oglethorpe, Inc. ("Oglethorpe") and its wholly owned subsidiaries and agents, defendants Willough Healthcare, Inc. d/b/a The Willough at Naples, Oglethorpe of Orlando, Inc. d/b/a The Blackberry Center, Oglethorpe of Port St. Lucie, LLC d/b/a Port St. Lucie Hospital, Springbrook Annex, LLC d/b/a Springbrook Hospital, Oglethorpe of St. Cloud, LLC d/b/a Heroes' Mile, Robert Cohen ("Cohen"), John Picciano ("Picciano"), and James O'Shea ("O'Shea") (collectively, "Defendants"), to obtain redress on behalf of the United States and Florida for Defendants' False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, and Florida False Claims Act ("Florida FCA"), Fla. Stat. §68.081, *et seq.* (2013), violations resulting from the provision of kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b) ("AKS"), and the knowing provision of worthless services paid for by Medicare, Medicare Part C plans (collectively, "Medicare") and Medicaid.

2.     This action is based on allegations that from at least 2016 to the present, Defendants knowingly submitted false claims to the United States

1

that improperly billed Medicare for psychiatric treatments. This action is also based on the fact that, from 2016 to present, Defendants knowingly submitted false claims to Florida that improperly billed Medicaid for psychiatric treatments.

3. Moreover, Defendants pay kickbacks to their marketers for each recruited and admitted patient. The marketers convince insured persons to be admitted, often repeatedly, to one of Defendants' facilities. Defendants provide free transportation to patients seeking admission to an Oglethorpe facility, regardless of the patient's distance from an Oglethorpe location. After patients are admitted, Defendants' inpatient services are billed to Medicare and Medicaid.

4. Defendants knowingly provide worthless behavioral care to those with psychiatric diseases, substance abuse disorders, and persons with substance abuse and co-occurring behavioral disorders (dual diagnosis).[2] The services are worthless because they are either not performed or are so far below the medical standard of care for psychiatric treatments and substance abuse rehabilitation as to be worthless. Defendants hide their worthless care by directing employees to falsify medical records post-patient discharge,

---

[2] "Dual diagnosis" refers to persons with mood disorders such as depression or bipolar disorder and co-existing drug or alcohol addictions. Dual diagnosis programs are designed to treat both the mood disorders and addictions.

thereby making it appear that reasonable and necessary medical care had been provided.

5.    In January 2021, defendant Oglethorpe entered a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services ("HHS") Office of Inspector General resulting from a settled FCA lawsuit alleging that, among other things, defendant Oglethorpe paid marketers kickbacks in exchange for securing patient admissions to its Ohio facilities.  Defendant Oglethorpe paid the United States $8.5 million to settle those allegations.

6.    Defendant Oglethorpe is now knowingly repeating these improper and lucrative activities at multiple locations.  At least one of Defendants' marketing employees transferred from an Ohio location to The Willough at Naples after the Ohio allegations resolved.  That employee receives kickbacks based on the volume of patients he refers for admission to The Willough at Naples.

7.    As a result of their actions, Defendants have knowingly violated the FCA and Florida FCA, and the CIA entered into in 2021.  As a result of Defendants' actions, the United States and Florida have been harmed.  The intentional wrongful conduct alleged herein is believed to have resulted in more than tens of millions of dollars in damages to the United States.

3

## II.    JURISDICTION AND VENUE

8.    Jurisdiction is founded upon the FCA, 31 U.S.C. §3732(a) and (b), and the Florida FCA, Fla. Stat. §68.083(2) and (3), and 28 U.S.C. §1331 and §1345.  Although the issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relators' knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this First Amended Complaint, as those concepts are used in 31 U.S.C. §3730(e).

9.    Whether or not such a disclosure has occurred, Relators would qualify as "original sources" of the information on which the allegations or transactions in this First Amended Complaint are based.  Before filing this action, Relators voluntarily disclosed to the government the information on which the allegations or transactions in this First Amended Complaint are based.  Additionally, Relators have direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to their claims.

10.    The Court may exercise personal jurisdiction over the Defendants because one or more of the Defendants transacts business in this District, engaged in the alleged illegal activities and practices in this District, and/or is headquartered in this District.

4

11. Venue is proper in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b). Defendants are found in and transact business in Florida, and some of the conduct which gives rise to the fraudulent claims set forth herein occurred in Florida.

## III. PARTIES

12. The United States is the real party in interest to the FCA claims in this action. Through the HHS and the Centers for Medicare & Medicaid Services ("CMS"), the United States administers the Medicare and Medicaid programs.[3]

13. Florida is the real party in interest to the Florida FCA claims in this action. Through the Agency for Health Care Administration ("AHCA"), Florida administers the Florida Medicaid program.

14. Relator Treloar, a registered nurse and resident of Florida, brings this action on behalf of the United States and Florida. Relator Treloar was employed by defendant Oglethorpe at The Willough at Naples.

15. Relator Treloar reasonably believes that the conditions she witnessed at The Willough at Naples are occurring at all of Defendants' locations. Relator Treloar bases her beliefs and conclusions upon corporate practices and procedures she witnessed at The Willough at Naples, or lack

---

[3] The Medicaid program is jointly funded by the federal government and states.

5

thereof, including paying kickbacks to secure patient admissions and the facility's acceptance of kickbacks as a common and legitimate method of obtaining patient admissions. Relator Treloar also bases her beliefs on conversations she had with senior Oglethorpe and The Willough at Naples administrators that condoned and normalized the behaviors and activities discussed below.

16.    Relator Caruso is a resident of Davie, Florida. Beginning in about 1990 and continuing through about 2015, Relator Caruso worked for various skilled nursing facilities and healthcare providers, acting in a variety of finance and executive positions, including Chief Executive Officer ("CEO"), President, Chief Financial Officer, Controller, and Financial Manager. Relator Caruso has over thirty years of experience in the field of finance, health, and skilled nursing facilities.

17.    In January 2016, after a distinguished career working at several other health facilities, Relator Caruso applied for an open position at defendant Oglethorpe and was hired to serve as their Chief Fiscal Officer, a position he held until about April 11, 2022.

18.    For the most part, Relator Caruso's duties in his position as the Chief Fiscal Officer included, but were not limited to, reviewing cash management, collections, revenue cycle management, and financial operations. In addition to his general duties, during certain Medicare audits

6

where the federal government requested supporting documentation for claims already paid to defendant Oglethorpe, Relator Caruso would instruct others to gather and provide appropriate physician documentation to determine if Defendants were able to justify medical necessity for Medicare billing.

19.     Due to Relator Caruso's extensive work experience in the finance and healthcare field, he is aware of the requirements associated with billing Medicare, which includes being able to confirm and maintain appropriate medical records and physician certifications to justify medical necessity.

20.     Relator Skinner is a resident of Hillsborough County, Florida. Relator Skinner is a healthcare executive that since 1996 has served in various executive roles at public, private, and non-profit hospitals and physician enterprises, including serving as Chief Nursing Officer, Chief Operating Officer, and CEO.  She is a Fellow of the American College of Healthcare Executives.

21.     In January of 2020, defendant Oglethorpe hired Relator Skinner to serve as its National Operations Director.  In that role, Relator Skinner oversaw the day-to-day operations of defendant Oglethorpe's facilities.

22.     Relator Snook is a resident of Pinellas County, Florida.  Relator Snook is a Certified Public Accountant that since 1989 through the present has worked as a Chief Financial Officer for various hospitals and health care

7

companies. Relator Snook has over thirty years of experience in health care finance.

23.  In or about August 2020, Relator Skinner, who then worked for defendant Oglethorpe, contacted Relator Snook about a position with Oglethorpe. After completing the interview process, defendant Oglethorpe offered Relator Snook the position of Finance Manager. In that role, Relator Snook was responsible for general accounting duties, cash management and financial operations, and revenue cycle management. Relator Snook routinely dealt with issues related to defendant Oglethorpe's income from Medicare and Medicaid.

24.  Defendant Oglethorpe is a Florida private, for-profit corporation created in 1999 by defendant Cohen and located at 201 North Franklin Street, Suite 1910, Tampa, Florida 33602. CEO defendant Picciano, Chief Operating Officer defendant O'Shea, and defendant Cohen are defendant Oglethorpe's directors. Defendant Oglethorpe offers management solutions for a portfolio of at least ten health centers, wellness clinics, and hospitals in Florida, Ohio, Texas, Louisiana, and Nevada.[4] Defendant Oglethorpe supports over 1,200 employees.

---

[4] *See* Oglethorpe, Inc., Facilities Locator, available at http://www.oglethorpeinc.com.

8

25.    Defendant Willough Healthcare, Inc. d/b/a The Willough at Naples ("Willough") is a Florida private for-profit corporation, created in 1984, with corporate offices at 201 North Franklin Street, Suite 1910, Tampa, Florida 33602. Defendants Picciano, O'Shea, and Cohen are defendant Willough's officers. The Willough at Naples, defendant Willough's registered fictitious name since at least August 23, 2007, is located at 9001 Tamiami Trail East, Naples, Florida 34113. The Willough at Naples is an eighty-seven-bed facility that provides, among other things, inpatient behavioral health treatment, substance abuse treatment, and a dual diagnosis program.

26.    Defendant Oglethorpe of Orlando, Inc. d/b/a The Blackberry Center ("Orlando"), is a private for-profit corporation created in July 2012 and located at 201 N. Franklin Street, Suite 1910, Tampa, Florida 33602. Defendants Cohen, O'Shea, and Picciano are defendant Orlando's officers. The Blackberry Center, defendant Orlando's registered fictitious name since at least April 14, 2015, is located at 91 Beehive Circle Drive, St. Cloud, Florida 34769. The Blackberry Center provides, among other things, inpatient behavioral health treatment, substance abuse treatment, and a dual diagnosis program.

27.    Defendant Oglethorpe of Port St. Lucie, LLC d/b/a Port St. Lucie Hospital ("Port St. Lucie"), is a Florida limited liability company created in October 2005 and located at 201 N. Franklin Street, Suite 1910, Tampa,

9

Florida 33602.  Defendants Cohen and O'Shea are defendant Port St. Lucie's officers.  Port St. Lucie Hospital, defendant Port St. Lucie's registered fictitious name since at least July 18, 2016, is located at 2550 SE Walton Road, Port St. Lucie, Florida 34952.  Port St. Lucie Hospital is a seventy-five-bed inpatient mental health facility that provides mental health and substance abuse treatment.

28.    Defendant Springbrook Annex, LLC d/b/a Springbrook Hospital ("Springbrook"), is a Florida limited liability company created in January 2015 and located at 201 N. Franklin Street, Suite 1910, Tampa, Florida 33602.  Defendants Cohen and Picciano are defendant Springbrook's officers. Springbrook Hospital, defendant Springbrook's registered fictitious name since at least May 29, 2014, is located at 7007 Grove Road, Brooksville, Florida 34609.  Springbrook Hospital is a sixty-six-bed inpatient mental health facility that also provides a dual diagnosis program and general psychiatric care.

29.    Defendant Oglethorpe of St. Cloud, LLC d/b/a Heroes' Mile ("St. Cloud"), is a Florida limited liability company created in September 2013 and located at 201 N. Franklin Street, Suite 1910, Tampa, Florida 33602. Defendants Cohen, Picciano, and O'Shea are defendant St. Cloud's officers. Heroes' Mile, defendant St. Cloud's registered fictitious name since at least April 11, 2019, is located at 2775 Big John Drive, Deland, Florida 32724.

10

Heroes' Mile is a substance abuse, post-traumatic stress disorder ("PTSD") and military sexual trauma inpatient program for military service veterans with addiction and other psychological conditions. Heroes' Mile also offers a dual diagnosis program.

30. Internally, Defendants' employees and management refer to The Willough at Naples, The Blackberry Center, Port St. Lucie Hospital, Springbrook Hospital, and Heroes' Mile as "sister facilities."

31. Defendant Cohen is a resident of the state of Florida and is defendant Oglethorpe's Principal and Founder. Defendant Cohen founded the company in July 1999 and is currently one of three members of the Board ("Board") of defendant Oglethorpe. Defendant Cohen is also an officer of defendants Willough, Orlando, Port St. Lucie, Springbrook, and St. Cloud.

32. Defendant Picciano is a resident of the state of Florida and is defendant Oglethorpe's CEO, is one of three members of its Board, and has served in various positions within the company since at least 2001. Defendant Picciano is also an officer of defendants Willough, Orlando, Springbrook, and St. Cloud.

33. Defendant O'Shea is defendant Oglethorpe's Chief Operating Officer, is one of three members of its Board, and has served in various positions within the company since at least 2001. Defendant O'Shea is an officer of defendants Willough, Orlando, Port St. Lucie, and St. Cloud.

11

## IV.   LEGAL BASIS OF THE ACTION

### A.   The FCA And The Florida FCA

34.   The FCA establishes liability for any person who: (i) knowingly presents or causes to be presented to the United States a false or fraudulent claim for payment or approval, 31 U.S.C. §3729(a)(1)(A); (ii) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. §3729(a)(1)(B); or (iii) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the federal government.  31 U.S.C. §3729(a)(1)(G).

35.   The term "knowingly" under the FCA means that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. §3729(b)(1).  Proof of specific intent to defraud is not required to show that a person acted knowingly under the FCA.  31 U.S.C. §3729(b)(1)(B).

36.   The statute allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery obtained.  It requires that the complaint be filed under seal for a minimum of sixty days (without service on the defendant during that time) to

12

allow the federal government time to conduct its own investigation and to determine whether to join the suit.

37.    Any person who violates the FCA is liable for a civil penalty of not less than $5,000, up to $11,000 (adjusted to $13,508 to $27,018 for penalties assessed after January 30, 2023, pursuant to 28 C.F.R. §85.5), for each violation, plus three times the loss sustained by the United States.  31 U.S.C. §3729(a); 28 C.F.R. §85.3(9).

38.    The AKS makes it a violation for those on both sides of a transaction if a person knowingly and willfully solicits or receives any remuneration in exchange for the referral of an individual for the furnishing or arranging for the furnishing of any item or services for which payment may be made, in whole or in part, under a federal healthcare program.  42 U.S.C. §1320(b).

39.    As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, §6402(f)(1), 124 Stat. 759, codified at 42 U.S.C. §1320a-7b(g), "a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of [the FCA]."  As stated in the legislative history of the PPACA, the purpose of this provision was to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under

13

the [FCA], even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

40. The Florida FCA establishes liability for any person who: (i) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; (iii) conspires to commit a violation of the statute; or (iv) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state. Fla. Stat. §68.082(2).

41. Persons found liable under the Florida FCA are liable for a civil penalty of not less than $5,500 and not more than $11,000 and treble the amount of damages the state sustains because of the act of the persons. Fla. Stat. §68.082(2)(g).

## B.    Medicare Laws And Regulations

42. Medicare is a federally operated health insurance program for individuals sixty-five years of age and older and/or disabled, administered by CMS. *See* 42 U.S.C. §1395c, *et seq.* The Medicare program has four parts. Medicare Part A pays some of the costs of, among other things, inpatient psychiatric treatment and/or substance abuse (drug and alcohol)

14

rehabilitation programs if a medical provider certifies that the services are reasonable and medically necessary. Medicare Part B pays some of the costs of, among other things, physician and other provider services delivered in inpatient psychiatric treatment and/or substance abuse rehabilitation programs.

43. Under Medicare Part C, or Medicare Advantage, private companies contract with Medicare to provide benefits similar to those offered by Parts A and B, including inpatient psychiatric treatment and substance abuse rehabilitation programs, and provider services delivered in inpatient psychiatric treatment and/or substance abuse rehabilitation programs. Medicare Part D pays, with some limits, prescription drug costs, including, but not limited to, those provided during inpatient psychiatric treatment or substance abuse rehabilitation programs, and medications prescribed post discharge.

44. Medicare Parts A and B require co-payments and/or deductibles for these services. Medicare Part C may require co-payments or co-insurance for these services.

45. A claim submitted to Medicare or Medicaid for payment qualifies for reimbursement if the provider certifies that: (i) the submitted information is true, accurate, and complete; (ii) the provider has familiarized itself with all applicable federal and state laws, regulations, and program instructions;

15

(iii) the provider has complied with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment, including, but not limited to, the AKS; and (iv) the services for which a submission is made were medically necessary and personally furnished by the provider or incident to the provider's professional services by an employee under her or his direct supervision. *See* CMS Form 1500.

46.    In order to assess whether healthcare goods and services are reasonable and necessary and whether reimbursement is appropriate, Medicare and Medicaid require that beneficiary services are reasonable, necessary, and completely substantiated by documentation in the medical records.  42 U.S.C. §1395y(1)(A); 42 U.S.C. §1365n; *see also* 42 U.S.C. §1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation)....").

47.    Worthless goods and services are those that are of such low quality as to have minimal value and be virtually worthless.  *See* Office of Inspector General, HHS, *Roadmap for New Physicians, Physician Relationship With Payers* at 12, Medicare Learning Network (January 2021), available at https://oig.hhs.gov/compliance/physician-education/02payers.asp. When a medical provider delivers services with no medical value, or grossly fails to perform the specified services or provide the described goods, those

16

goods and services are considered so deficient that they amount to not having performed the services or provided the goods at all. *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 703 (2nd Cir. 2001) ("In an appropriate case, knowingly billing for worthless services ... may be actionable under 31 U.S.C. §3729 regardless of any false certification conduct." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir.2001)).

### C. Medicare Payment For Inpatient Psychiatric Facility Treatment Services

48. Medicare pays for inpatient psychiatric facility ("IPF") treatment that includes psychiatric treatment programs or substance abuse rehabilitation under the IPF Prospective Payment System ("IFP PPS"). An IPF may receive IPF PPS payments if it: (i) is primarily engaged in providing, by or under the supervision of a psychiatrist, psychiatric services for the diagnosis and treatment of persons with mental health diagnoses; (ii) meets the Medicare hospital conditions of participation and special provisions for psychiatric hospitals set forth in 42 C.F.R. §482, Subpart E; (iii) maintains clinical records on all patients, including records sufficient to permit CMS to determine the degree and intensity of treatment furnished to Medicare beneficiaries, as specified in 42 C.F.R. §482.61; and (iv) meet the staffing requirements specified in 42 C.F.R. §482.62. 42 C.F.R. §482, Subpart E; 42 C.F.R. §412.23(a).

49.     Medicare payments may only be made for active psychiatric treatment that can reasonably be expected to improve the patient's condition. Medicare Benefit Policy Manual, Ch. 2, 30.2.2.  To determine whether the treatment can reasonably be expected to improve the patient's condition, Medicare's psychiatric special provisions require facilities to maintain clinical records sufficient to permit CMS to determine the degree and intensity of treatment furnished to Medicare beneficiaries.  42 C.F.R. §482.60; §482.62.

50.     Every patient's medical records must include:

a.     a provisional or admitting diagnosis made at admission, which must include the diagnoses of intercurrent diseases as well as the psychiatric diagnoses;

b.     the reasons for admission, which must be clearly documented as stated by the patient and/or others significantly involved;

c.     information noting the onset of illness and the circumstances leading to the admission; and

d.     an individual comprehensive treatment plan, which must be based on an inventory of the patient's strengths and disabilities. The written plan must include adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out. 42 C.F.R. §482.61.

51.    A patient's progress notes must be documented in the medical record in accordance with applicable state scope-of-practice laws and hospital policies. Notes must be entered by qualified licensed practitioners, including doctor(s) of medicine or osteopathy, who are responsible for the care of the patient; and nurses, social workers, or others significantly involved in the patient's active treatment modalities. Progress note frequency is determined by the patient's condition but must be recorded at least weekly and must contain precise assessments of the patient's progress in accordance with the original or revised treatment plan. 42 C.F.R. §482.61(d).

52.    A discharged patient's medical records must have a discharge summary that includes a synopsis of the patient's hospitalization, description of current condition, and recommendations for appropriate follow-up or aftercare services. 42 C.F.R. §482.61(e).

53.    Medicare's special provisions for psychiatric hospitals require IPFs to have adequate numbers of qualified professional and support staff to evaluate patients, formulate written individualized comprehensive treatment plans, provide active treatment measures, and engage in discharge planning. 42 C.F.R. §§482.60, 482.62. In addition to the director of nursing, there must be adequate numbers of registered nurses, licensed practical nurses, and mental health workers to provide care necessary under each patient's active

19

treatment program and to maintain progress notes on each patient. 42 C.F.R. §482.62(d).[5]

54.    CMS requires that IPF serving Medicare patients must primarily be engaged in providing psychiatric services for the diagnosis and treatment of mentally ill persons *under the direction of a physician*. 42 C.F.R. §482.1(a)(2) (emphasis added). Additionally, the IPF must meet staffing requirements that CMS finds necessary to carry out an active treatment program for individuals that the IPF serves. *Id.*

55.    Specifically, the inpatient services at the IPF must be provided under the supervision of a clinical director who is qualified to provide the leadership required for an intensive treatment program. 42 C.F.R. §482.62(b). And the IPF must maintain enough qualified doctors of medicine and osteopathy to provide essential psychiatric services. *Id.*

56.    Additionally, IPFs must have on staff a director of social services who monitors and evaluates the quality and appropriateness of the social services furnished. 42 C.F.R. §482.62(f). The social service director must have a master's degree from an accredited school of social work or be otherwise qualified (so long as at least one staff member has a master's degree). *Id.*

---

[5] Staff-to-patient ratios are set by state law. Florida does not have a law setting a minimum staff-to-patient ratio.

### D.   The Florida Medicaid Program

57.   Medicaid is a joint federal and state program that provides health care benefits for certain groups, primarily the poor and disabled. Medicaid also provides co-pay and other types of assistance to Medicare beneficiaries whose incomes qualify them for Medicaid assistance, also known as "dual eligibles." The federal portion of each state's Medicaid budget, known as the Federal Medical Assistance Percentage ("FMAP"), is determined based on the state's per capita income compared to the national average. *See* 42 U.S.C. §1396d(b). Florida's FMAP for fiscal year 2019-2020 was 60.87%, for fiscal year 2020-2021 was 61.47% (increased to 67.67% by the Families First Coronavirus Response Act (P.L. 116-127)) ("FFCRA"), and for fiscal year 2021-2022 was 61.96% (increased to 68.166% by the FFCRA).

58.   Florida Medicaid, administered by the Florida Department of Children and Families ("DCF"), provides healthcare coverage to approximately 4.4 million individuals. The Florida DCF is the designated "Mental Health Authority" in Florida. Fla. Stat. §394.457 (2020). Florida Medicaid rules for program administration are contained in the Florida Administrative Code ("F.A.C."), Chapter 59.

59.   Florida Medicaid requires that psychiatric treatment facilities must "furnish, through qualified personnel, psychological services, social work services, psychiatric nursing, occupational therapy, and recreational

21

therapy, as appropriate to the needs of the patient." F.A.C. Rule 59A-3.278(8)(c).

60.    Florida Medicaid requires that providers "ensure that the patient's medical records establish the medical necessity for and the extent of services provided [and] sign and date each medical record within two business days from the date and time of service...." F.A.C. Rule 59G-1.054(2)(a).

61.    Florida Medicaid rules require that, at each patient encounter, a provider must document a progress note containing, among other things, the date of service, the patient's chief complaint, and a description of the services rendered. F.A.C. Rule 59G-1.054 (2)(b).

62.    Florida Medicaid pays some or all the costs associated with a beneficiary's inpatient psychiatric and/or substance abuse treatment, and co-payments for dual eligible beneficiaries in a Medicare psychiatric and/or substance abuse treatment program.

63.    Under section 2005 of the Substance Use Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act (Pub. L. 115-271) and implemented in the final rule CMS-1715-F, "Revisions to Payment Policies under the Medicare Physician Fee Schedule, Quality Payment Program and other Revisions to Part B for CY 2020" published in the Federal Register on November 1, 2019, beginning on

22

January 1, 2020, Medicare became the primary payer for Part B opioid treatment provider services obtained by dually eligible beneficiaries and delivered by Medicare-enrolled opioid treatment providers. No Medicaid co-payment is required.

## V.    ALLEGATIONS OF DEFENDANTS' WRONGDOING

64.    Defendants are providers of behavioral health treatment services for patients suffering from mental disturbances and conditions.

65.    From at least 2016 until the present, Defendants have conducted a scheme to defraud the United States and Florida governments by knowingly and unlawfully submitting numerous false claims to Medicare and Medicaid for services that were not supported by appropriate, legally required, underlying documentation.

66.    According to HHS's IPF PPS, treating physicians are required to submit certifications to justify the medical necessity of inpatient psychiatric services.

67.    The certifications used by defendant Oglethorpe are physical sheets of paper which are signed and dated by the treating psychiatrist who claim to be on-site at the time of signing. The certifications used by defendant Oglethorpe and the sister facilities also state the following:

> The undersigned hereby certifies that inpatient psychiatric hospital services, furnished since the previous certification, were, and continue to be, medically necessary for: [PATIENT NAME] Treatment which

23

could reasonably be expected to improve the patient's condition OR [INSERT] Diagnostic study.

68.    These certifications take place at different points during a patient's admission to one of Defendants' sister facilities.  The first certification, also known as the initial psychiatric evaluation, must be completed within twenty-four hours, and no later than sixty hours, of the patient's admission to establish medical necessity.  Medicare rules also require that subsequent certifications, also known as re-certifications, are prepared on the twelfth day of hospitalization and at intervals established by the hospital's utilization review committee (on a case-by-case basis if it so chooses), but no less than every thirty days after the first re-certification.

69.    Defendant Oglethorpe's internal utilization review required a re-certification on the thirtieth day and then every fifteen days after that.  In other words, a re-certification was required to be completed on day forty-five, day sixty, and so on.[6]

70.    All certifications are filed in the clinical record of each patient admitted and saved in a patient file cabinet in the utilization review department or medical records room of each hospital.  It is defendant

---

[6] Since a certification is submitted within the first twenty-four hours (and no later than sixty hour of admission in order to establish medical necessity), on the twelfth day, thirtieth day, and every fifteen days thereafter, a patient with an average length of stay of forty-five days is supposed to have one certification and three re-certifications, for a total of four certifications.

24

Oglethorpe's normal and customary practice to bill Medicare and Medicaid within seventy-two hours after a patient is discharged from one of Defendants' sister facilities. The reimbursement amount is related to certain diagnoses associated with the patient's stay and alleged treatment by the on-site physician based on the signed certifications.

71.     From at least 2016 to the present, Defendants routinely and aggressively billed Medicare and Medicaid for services purportedly but not actually rendered. Defendants' wrongful conduct was intentional and systematic in that they constantly pushed claims for payment to be submitted to Medicare and Medicaid, despite knowing that there was a clear lack of appropriate and legally required underlying documentation to support those claims. This was usually in the form of missing or suspicious physician certifications.

72.     Defendants' wrongful billing practices are not just a result of being sloppy or disorganization. As provided by Relators in further detail below, during the time from at least 2016 to the present, including after the January 2021 CIA compliance requirements, Defendants had numerous opportunities to clean up their known wrongful billing practices. Instead, Defendants knowingly insisted that the wrongful billing practices continue without any changes or delay. Although Defendants knew that a significant amount of the claims being submitted to Medicare and Medicaid during this

25

timeframe were not supported by legally required and valid certifications, Defendants knowingly continued to cause the numerous unsupported claims to be submitted to Medicare and Medicaid for payment.

73.    Defendants knew that their own internal electronic records system, if properly audited, would reveal that numerous claims for patient treatment were not supported by legally valid certifications and were in fact false claims to the government.  Despite this knowledge, Defendants knowingly failed to make any changes in the process of certifications or require providers to properly certify patient care.

74.    Specifically, Defendants knew that many of the claims they submitted to Medicare and Medicaid during the time period alleged were not supported by certifications because the certifications were: (i) not signed by a physician at all; (ii) suspiciously dated and signed (such as being dated prior to the treatment date noted); and/or (iii) missing altogether.  As provided by Relators in further detail below, Defendants knew the certifications were lacking because they had been advised of the problem before and during the wrongdoing.  Moreover, Defendants even took steps to actively conceal the wrongdoing alleged.

75.    Trusting that Medicare and Medicaid would not have the resources to investigate or prevent Defendants' ongoing wrongful billing practices, Defendants chose to continue their billing practices, knowingly and

26

recklessly billing Medicare and Medicaid for false claims. Defendants Cohen, Picciano, and O'Shea admitted that they would deal with any consequences later.

76. Importantly, Defendants recently entered into a CIA with the federal government for wrongdoing in the past. Upon information and belief, it appears that Defendants are submitting or causing the submission of false certifications to the federal government in the context of the CIA as well.

77. Thus, in violation of the FCA, Defendants knowingly submitted (or caused the submission of) false claims/attestations to Medicare and Medicaid, in order to get millions of dollars of payments; and, Defendants also caused false certifications to be submitted to the federal and state governments in the context of the CIA.

## VI.    DEFENDANTS KNOWINGLY PRESENT FALSE CLAIMS

### A.    Defendants Knowingly Submit False Claims To Medicare And Medicaid, Fabricate Medical Records For Audits, And Instruct Employees To Falsify Certifications

78. Starting in 2016, one of Relator Caruso's duties while employed as the Chief Fiscal Officer of defendant Oglethorpe was to review responses to Medicare audits. The Medicare audits typically requested documentation to justify inpatient medical necessity and Medicare billing.

27

79.    As provided by Relators in further detail below, from at least 2016 to at least April 2022, Defendants had been submitting false claims to Medicare for services that Defendants knew were not supported by proper and legally required physician certifications.

80.    For example, from at least 2016 through 2022, Relator Caruso became aware, due to his communications with Medicare, that almost every claim that was audited or reviewed (or at least a significant percentage of such claims) was lacking at least one or more proper certifications to support the underlying claims.  Moreover, even if certifications were present, appropriate supporting documentation either did not exist or failed to support the certifications.  As detailed below, this was corroborated during Medicare audits and later with the independent advisory report provided to Defendants pursuant to the CIA.

81.    Within a year after starting work with defendant Oglethorpe, Relator Caruso's review showed that almost every claim Medicare audited or reviewed was denied due to lack of supporting documentation.  While Relator Caruso provided this information to defendant Oglethorpe and the Board, as alleged herein, Defendants knew that what they were doing was wrong. Defendants Cohen, Picciano, and O'Shea allegedly believed that if they submitted a large number of claims to Medicare, which Defendants knew were often not supported by required certifications and/or not supported by

28

appropriate underlying documentation, that Medicare would or could not audit—and thus could not reject—the vast majority of false claims submitted.

82.    Over a period of two years, during 2016 through 2018, defendant Oglethorpe's facilities were subject to approximately three or four Medicare audits.  The audits, two of which involved The Willough at Naples, requested information to support payments for claims which were already reimbursed.  However, Defendants failed every single audit due to the lack of supporting documentation.  Relator Caruso shared this information with the Board, and repeatedly told the Board, including defendants Cohen, Picciano, and O'Shea, that defendant Oglethorpe must require physicians and other providers to adequately provide care and document the care provided.

83.    In mid-to-late 2018, defendant Oglethorpe's Board, consisting mainly of defendants Cohen, Picciano and O'Shea, had grown tired of Relator Caruso investigating and expressing concerns about the Defendants' Medicare claims and the lack of proper documentation and certifications supporting the same.  However, instead of taking action to correct the certification issues and falsities identified by Relator Caruso, Defendants removed Relator Caruso's utilization review responsibilities from his daily tasks and transferred those responsibilities to Dr. Richard Capiola ("Dr. Capiola"), Oglethorpe's Chief Medical Officer ("CMO"), at the time who also served in a dual capacity as the Medical Director at The Willough at Naples.

29

84. Dr. Capiola repeatedly signed off on documents to bill Medicare even though no efforts were made to correct the ongoing falsification of certification documentation at each and every Oglethorpe location.

85. During about 2019 and through 2022, as part of his duties as Chief Fiscal Officer for defendant Oglethorpe, Relator Caruso had access to MedEasy and Office Alley, the Defendants' billing and record-keeping systems. Relator Caruso would often access and review Defendants' electronic billing record systems to analyze Defendants' claims submitted to Medicare for purposes of revenue and cash management.

86. Among other things, the electronic records system would show the number of times a patient was purportedly seen/treated by a doctor and hence proper certifications were presumed to exist supporting those claims submitted to Medicare. However, over the years, more often than not, the certifications within a patient's clinical record files did not reconcile with the number of patient visits or medical records that should have existed in support of various claims that had already been submitted to Medicare for payment. That is, many of the claims that were being routinely and frequently submitted to Medicare, either had no certifications to support the claims, had an insufficient number of certifications to support the claims, and/or had false certifications in support of the claims.

30

87.    For example, from 2016 to 2021, certifications in the patient files relating to claims filed with Medicare, were often not signed by a physician at all, or were suspiciously dated and signed, such as purportedly being signed by a physician prior to the treatment dated on the certification.  This occurred at all of defendant Oglethorpe's facilities, examples of which are included in the independent advisory reports.  As further detailed herein, and by further example, a sample set of Medicare claims and the related underlying patient files taken from the Ridgeview Behavioral Hospital in Middle Point, Ohio, show that some doctors who purportedly signed the required certifications were either out of the office or on vacation at the time that the certifications were supposedly signed.

88.    From 2019 through 2022, Defendants continued with their systematic submissions of false claims to Medicare.

89.    During regularly scheduled weekly meetings, Relator Caruso repeatedly communicated his concerns to all three of the Board members of defendant Oglethorpe—defendants Cohen, Picciano, and O'Shea. Specifically, Relator Caruso voiced his concerns regarding the systematic wrongful conduct, which was resulting in numerous improperly supported claims being routinely submitted to Medicare (as well as to commercial insurance and managed care plans).

31

90. Similarly, on several occasions via e-mail, the individual defendants would ask Relator Caruso about the status of the Company's revenue and receivables. During these e-mail conversations, Relator Caruso would often, once again, repeat his concerns regarding how a high percentage of all claims being submitted by Defendants (to Medicare, Medicare managed care plans, and Medicaid as well) lacked proper documentation proving medical necessity. Despite Relator Caruso's many warnings to defendants Cohen, Picciano and O'Shea, via in-person meetings and e-mails, Defendants chose to ignore Relator Caruso's concerns and refused to address defendant Oglethorpe's wrongful billing practices.

91. Throughout 2019, 2020, and most of 2021, Defendants continued to wrongfully bill Medicare as alleged herein. Dr. Capiola continued to act as CMO and was used by Defendants to repeatedly, systematically, and wrongfully bill Medicare during this time period.

92. Then, in early September 2021, Dr. Capiola was fired by the Defendants. Dr. Capiola was used as a "scapegoat" by Defendants.

93. Following the termination of Dr. Capiola, Defendants made Dr. Muhannad Kassawat ("Dr. Kassawat") the new CMO. Unlike Dr. Capiola, who appeared to cooperate with the Defendants' fraudulent billing scheme, Dr. Kassawat was taking the CMO role and the related Medicare rules very seriously.

94.    For instance, prior to Dr. Kassawat taking over as CMO, a sample of the claims was conducted by Relator Caruso that revealed several suspicious instances of billing Medicare for very expensive "extended stays." In comparison to the two-month period from about September 2021 through October 2021 under Dr. Kassawat's oversight, a comparable sample of claims revealed *zero* suspicious extended-stay claims being billed to Medicare. Dr. Kassawat was fired by Defendants in late October 2021, just two months after he took over the CMO duties.

95.    Not long after Dr. Kassawat was fired, another comparable sample of Medicare claims was tested. Defendant Oglethorpe's own employees determined that, once again, numerous suspicious (and expensive) extended-stay claims were being billed to Medicare by the Defendants. Relator Caruso reported the audit results to his superiors. When Relator Caruso asked defendant Picciano who would replace Dr. Kassawat, defendant Picciano stated, words to the effect of, "if [Dr. Kassawat] stayed as our CMO, we won't have a company to run." Defendant Picciano further stated that the Board had decided the CMO position "has been eliminated."

96.    Overlapping with the above events, Defendants hired The Fox Group, LLC ("Fox") as an independent advisor to review, analyze, and make recommendations to correct Defendants' internal processes for purposes of Medicare billing. Although Fox was supposed to begin its analysis of

33

Defendants' internal records in or around April 2021, in accordance with the CIA's ninety-day deadline, Fox only began performing an analysis of Defendants' billing processes in or around August 2021.

97. During the course of Fox's analysis of Defendants' internal procedures, Fox's findings generally corroborated Relator Caruso's findings that Defendants routinely failed to properly document purported patient treatments, resulting in the inability to justify the medical necessity of patients' treatments—meaning that Defendants submitted numerous and repeated false claims to Medicare for payment.

98. Among other things, Fox's report findings concluded that: "Medical necessity is often not clearly justified or the justification is substandard"; and that there are "inconsistencies in forms used for same process, illegible and missing signatures and documentation."

99. Further, on or about November 3, 2021, Fox prepared an additional report for Defendants titled, "Documenting to Medical Necessity." This was a mock report of a sample of ten claims that were to be paid to Defendants between June 15, 2021 and September 15, 2021, for services that allegedly took place at Georgetown Behavioral Hospital in Georgetown, Ohio, one of Defendants' affiliate hospitals. All ten of the sample admission claims submitted by Georgetown Behavioral Hospital were wrong, resulting in an error rate of 100%. Fox estimated that the overpayment for those ten claims

34

was significant and that *"[d]ue to the 100% error rate, all funds received from a federal healthcare plan would be subject to refund."* The mock report further stated that the reasons for the overpayments and the error rate were as follows: "found to NOT be partially or completely medically necessary" and "severe documentation issues."

100.  On or about November 11, 2021, Fox issued an additional report titled, "Documentation Review."  This reporting was of the findings and recommendations of the sample of the ten claims for services that allegedly took place at Georgetown Behavioral Hospital between June 15, 2021 and September 15, 2021.  Despite being in a time crunch due to their significant delay in Fox's start date, Defendants failed to make many of the changes that Fox previously urged Defendants put in place to avoid future denials or refunds for lack of justified medical necessity.

101.  On or about December 15, 2021, following Dr. Kassawat's suspicious termination, the decision to eliminate the CMO position, and the Fox findings,  Relator Caruso confronted defendant Oglethorpe's CEO, defendant Picciano, during a meeting in the CEO's office in Tampa, Florida, regarding the numerous, long-standing, and ongoing wrongful billing practices to Medicare and Medicaid.  The meeting was not productive. Defendant Picciano was well aware of Relator Caruso's concerns but was

35

tired of hearing about them. Among other things, defendant Picciano's main response to Relator Caruso was to *"shut the f\*ck up and keep billing."*

102. Defendant Picciano clearly intended to continue in the wrongdoing by commanding Relator Caruso to stop trying to correct Defendants' wrongful billing practices to Medicare and Medicaid regardless of the falsity of the claims.

103. Defendant Picciano's volatile instructions confirmed that Defendants were committed to the wrongful business practices alleged and would not be deterred from continuing to illegally collect millions of dollars from the federal government through the submission of false claims to Medicare and Medicaid.

104. In January 2022, in addition to retaining Fox, Defendants also retained BHM Healthcare Solutions ("BHM") as Defendants' official Independent Review Organization.

105. Like with Fox, BHM was supposed to start its review and analysis of Defendants' Medicare billing processes in April of 2021. However, defendant Oglethorpe failed to provide BHM with timely responses to document requests which ultimately delayed BHM's start date until January 2022.

106. As part of BHM's duties, BHM performed a review of 100 patient charts located at Ridgeview Behavioral Hospital in Middle Point, Ohio, one of

Defendants' affiliates.  Among the thousands of patients Defendants have allegedly treated over the years, within this small sample, sixty-two certifications/records were missing for forty-eight patients.

107.   In January 2022, Defendants recruited Patrick Tracy ("Tracy"), Oglethorpe's longtime Director of Marketing, to fly out to Ohio.  Defendants utilized Tracy as a premeditated move to "handle" the issues relating to the scrutiny Defendants were facing as a result of the allegations herein.  Tracy is generally known by Defendants as the "fixer."

108.   Defendants' plan regarding Tracy came to fruition when BHM raised the issue regarding the sixty-two missing certifications.  Tracy was tasked with "finding" the missing sixty-two certifications/records in Ohio.

109.   Sometime in about March of 2022, Tracy allegedly "found" the missing sixty-two certifications/records in Ridgeview Behavioral Hospital's utilization review department.  However, the certifications Tracy "found" were actually fabricated.

110.   The sixty-two missing certifications/records were not just "found." In fact, on or about April 1, 2022, Tracy called Relator Caruso and admitted that he had essentially manipulated Dr. Teymour Sepahbodi ("Dr. Sepahbodi"), a psychiatrist at Ridgeview Behavioral Hospital, to backdate the signatures on the certifications so that they appeared as though they were signed on the proper re-certification dates for each of the forty-eight patients.

37

Tracy further admitted to Relator Caruso on the call that he, Tracy, filled out the forms and "came up with the dates" for the treatments so that Dr. Sepahbodi could sign them. Tracy referred to this incident as a *"little signing party."*

111. Moreover, of the sixty-two certifications, *thirty-seven of them were on dates where Dr. Sepahbodi was not present in the hospital.* In fact, Dr. Sepahbodi was actually on vacation or working at another hospital at the time many of the certifications were allegedly signed.

112. The sixty-two certifications include the following attestation language signed by Tracy, dated March 31, 2022, which is false (i.e., the documentation was not "located in the utilization review department," it was fabricated, as alleged above):

> The following recertification documentation was located in the utilization review department where it had not been filed into the medical record prior to shipment out to the facility.

113. Also in January 2022, overlapping with some of the events alleged above, all employees took part in compliance training. Among other things, the training provided instructions relating to Medicare billing needing to be supported by documentation (such as physician certifications) ensuring justification of medical necessity.

114. Immediately in response to the training, Relator Caruso, and two other Oglethorpe employees, Warren Knight (Chief Financial Officer) and

38

Brenda Jones (Revenue Cycle Director), sent a signed letter to Scott Price ("Price"), Oglethorpe's Compliance Officer, raising concerns regarding the Defendants' long-standing and ongoing failure to prove medical necessity during its audits. Another point made in the letter to Price was that the former CMO, Dr. Capiola, was relieved of his position and was replaced by Dr. Kassawat. Dr. Kassawat was terminated on or about October 31, 2021, and the CMO position had been eliminated. With this, no one was properly reviewing the medical records to ensure the presence of, or justification for, medical necessity.

115. On or about February 4, 2022, Relator Caruso sent another e-mail to Price. Relator Caruso's e-mail again generally outlined the concerns that he had been expressing for years. For example, Relator Caruso reiterated his concerns regarding Defendants' wrongful conduct as alleged herein, regarding violations of the law with regard to Medicare billing.

116. Moreover, around this this same time, Relator Caruso recalls being asked to sign off on a certification. It was Relator Caruso's understanding that Defendants were required to have various individuals, all of whom are in executive positions, submit an annual management certification for each reporting period (the "Management Certification"). Relator Caruso refused to sign off on the Management Certification.

117.   On April 8, 2022, Relator Caruso submitted another letter, which was this time addressed to defendant O'Shea, one of defendant Oglethorpe's Board members.  In this letter, Relator Caruso outlined several reasons for not wanting to sign the Management Certification.

118.   Based on the conduct alleged herein, Defendants have submitted certifications to Medicare, Medicaid, and the Office of Inspector General of HHS that are not accurate.

### B.   Defendants Pay Kickbacks To Obtain Medicare And Medicaid Patients Willing To Be Voluntarily Admitted For Inpatient Treatment Services

119.   Defendants employ former and relapsing substance abuse addiction sufferers as marketers at each location.  Defendants pay kickbacks to the marketers in exchange for the value and volume of Medicare and Medicaid patients that the marketers entice to be voluntarily admitted for Defendants' inpatient treatment services.

120.   At defendant Willough, Defendants employ Tracy and Carli Perlman ("Perlman") as marketers.  Tracy is a recovering addict.  Tracy and Perlman coerce and/or entice patients into voluntarily admitting themselves for treatment.

121.   Each day, Defendants' marketers drive to homeless encampments and other places where known addiction sufferers congregate.  The marketers entice addiction sufferers to be admitted to one of Oglethorpe's sister facilities

40

with promises of three meals a day, access to a warm shelter and bed, horseback riding, and spa services.[7]

122.   Many of these addicted persons are not actively seeking treatment but are enticed by the marketer's pitch.  Approximately 50% of these addicted persons are previous Oglethorpe patients who are repeatedly re-admitted.

123.   Once patients are admitted, Defendants pay kickbacks to Tracy, Perlman, and other marketers in the form of a fee or bonus based on the volume of admissions obtained.  Defendants and the marketers know that patient referrals will result in kickbacks.

124.   Every patient file[8] begins with a "FACE sheet"[9] that contains, among other information, the referral source's name.  Oglethorpe's marketers are listed on FACE sheets as their main referral source.

125.   Marketers recruit some patients who live far from Defendants' facilities.  Defendants employ van drivers who provide free transportation to their sites, often from hundreds of miles away.  Van drivers transport

---

[7] Defendant Willough's marketers tell patients that the facility has horseback riding and spa services.  Defendant Willough does not have these services.

[8] Defendant Oglethorpe's medical records are maintained in paper format.

[9] A "FACE sheet" is a one-page summary of important information about a patient, including their full name and address, emergency contact, main diagnosis, insurance information, and referral source.

41

patients to The Willough at Naples and other Oglethorpe sister facilities. Free transportation is, upon information and belief, offered at each location.

126.  Perlman's and Tracy's referrals, and other marketers' referrals, are lucrative for defendant Oglethorpe.  At The Willough at Naples, administrators value Tracy's services and allow him to write treatment notes in patient charts as if he was a provider.  In the summer of 2021, Tracy and a charge nurse had a verbal altercation regarding Tracy's improper documentation in charts.  Tracy, a recovering addict, receives substance abuse treatment services at The Willough at Naples when he relapses.

127.  Defendants' kickbacks to marketers in exchange for recruiting patients for services paid by Medicare and Medicaid violate the AKS. Defendants' free, long-distance transportation services, used to entice patient admissions paid by Medicare and Medicaid, are kickbacks in violation of the AKS.

128.  Based on Relator Treloar's observations and discussions with other staff members, defendant Oglethorpe's payment of kickbacks for admissions is a long-standing practice that started several years before Relator Treloar's employment began with defendant Oglethorpe.

129.  The following patients were referred by either Tracy or Perlman and then admitted to The Willough at Naples, resulting in an improper kickback paid to either Tracy or Perlman:

42

a.    On June 4, 2021, patient A, a Medicare beneficiary who resides in Winchester, Virginia, was voluntarily admitted to the psychiatric program with a diagnosis of bipolar disorder, episodic manic behavior without psychotic features, and alcohol and opiate dependence.  Tracy was the referral source.

b.    On June 13, 2021, patient B, a United Behavioral Health Medicare beneficiary, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of alcohol dependence.  Tracy was the referral source.

c.    On June 17, 2021, patient C, a Medicare and Florida Medicaid beneficiary, was voluntarily admitted to the psychiatric program with a diagnosis of major depressive disorder, recurrent, unspecified.  Tracy was the referral source.

d.    On June 18, 2021, patient D, a Medicare beneficiary with an Aetna Medicare supplement who resides in Philadelphia, Pennsylvania, was voluntarily admitted to the psychiatric program with a diagnosis of major depressive disorder, recurrent, unspecified, and cocaine dependence.  Tracy was the referral source.

e.    On June 18, 2021, patient E, a Medicare/United Behavioral Health and United Behavioral Health Dual Special Needs Plan

43

("SNP")[10] beneficiary, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of alcohol dependence, PTSD, and major depressive disorder. Tracy was the referral source.

f.    On June 18, 2021, patient F, a Medicare beneficiary, was voluntarily admitted to the psychiatric program with a diagnosis of bipolar disorder and opiate and cocaine dependence. Tracy was the referral source.

g.    On June 21, 2021, patient G, a Medicare beneficiary, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of sedative, hypnotic, or anxiolytic dependence. Tracy was the referral source.

h.    On June 25, 2021, patient H, a Humana Medicare beneficiary with Florida Medicaid as secondary insurance, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of drug dependence and bipolar disorder. Perlman was the referral source.

i.    On June 30, 2021, patient I, a Staywell beneficiary[11], was voluntarily admitted to the detox/dual diagnosis program, with a

---

[10] An SNP is the name given to some healthcare plans for dually eligible Medicare/Medicaid beneficiaries.

[11] Staywell is a Florida Medicaid plan.

44

diagnosis of alcohol and sedative dependence with an anxiety disorder. Tracy was the referral source.

j.      On July 7, 2021, patient J, a Medicare/United Behavioral Health beneficiary, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of alcohol and sedative dependence and depressive disorder.  Perlman was the referral source.

k.      On July 8, 2021, patient K, a Wellcare Medicare beneficiary with Wellcare dual SNP, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of alcohol dependence and major depressive disorder.  Tracy was the referral source.

l.      On July 22, 2021, patient L, a Staywell beneficiary, was voluntarily admitted to the detox/dual diagnosis program with a diagnosis of bipolar disorder and sedative dependence.  Tracy was the referral source.

m.      On July 26, 2021, patient M, a Medicare beneficiary, was voluntarily admitted to the psychiatric program with a diagnosis of major depressive disorder and cocaine dependence.  Tracy was the referral source.

n.      On August 13, 2021, patient N, a Wellcare and Wellcare dual SNP beneficiary, was voluntarily admitted to the detox/dual

45

diagnosis program with a diagnosis of opiate dependence and bipolar disorder.  Tracy was the referral source.

o.      On August 25, 2021, patient O, a Medicare beneficiary, was voluntarily admitted to the psychiatric program with a diagnosis of major depressive disorder, and alcohol dependence.  Tracy was the referral source.

130.   For each of these patients, and other patients similarly situated, Defendants, upon information and belief, submit claims for inpatient services to Medicare, Medicaid, and/or Medicare Part C plans for payment, and are paid by Medicare, Medicaid, and/or Medicare Part C plans.

131.   Relators reasonably believe Defendants submit claims for these and similarly situated patients to Medicare and Medicaid because Defendants make extraordinary efforts to alter their deficient medical records to satisfy Medicare and Medicaid documentation requirements and withstand audits.  Defendants direct their employees, including Relators and other staff members, to review closed charts, flag missing documentation, and create false documentation in preparation for Medicare and Medicaid audits.

132.   Defendant Oglethorpe regularly warns its sister facilities when it is aware of upcoming Florida Medicare or Medicaid audits in order to permit each facility time to "fix" its charts.  When scheduled or surprise audits are

46

anticipated, Defendants' employees hold "charting parties" where staff grab armfuls of charts, review charts for missing documentation, and create false documentation to mislead auditors.

133. Relators reasonably believe that Defendants are paid for their submissions because Defendants admit large numbers of Medicare and Medicaid patients and actively recruit Medicare and Medicaid patients, supporting the conclusion that Defendants submit claims to, and are paid by, Medicare, Medicaid, and Medicare Part C.

134. At a minimum, Defendants submitted false claims tainted by kickbacks, and were paid for claims, for the following patients:

a. Patient A was admitted to The Willough at Naples on June 4, 2021, and discharged on or about July 2, 2021. Defendants submitted claims for payment for patient A's care to Medicare on or after July 2, 2021, and were paid by Medicare for services allegedly provided to patient A.

b. Patient B was admitted to The Willough at Naples on June 13, 2021, and discharged on or about June 18, 2021. Defendants submitted claims for patient B's care for payment or approval to United Behavioral Health Medicare on or after June 18, 2021, and were paid by United Behavioral Health Medicare for services allegedly provided to patient B.

47

c.     Patient C was admitted to The Willough at Naples on June 17, 2021, and discharged on or about July 15, 2021.   Defendants submitted claims for payment for patient C's care to Medicare and Florida Medicaid on or after July 15, 2021, and were paid by Medicare and Florida Medicaid for services allegedly provided to patient C.

d.     Patient D was admitted to The Willough at Naples on June 18, 2021, and discharged on or about June 25, 2021.   Defendants submitted claims for payment for patient D's care to Medicare and Aetna Medicare supplemental insurance on or after June 25, 2021, and were paid by Medicare and Aetna Medicare supplemental insurance for services allegedly provided to patient D.

e.     Patient E was admitted to The Willough at Naples on June 18, 2021, and discharged on or about June 21, 2021.   Defendants submitted a claim for payment for patient E's care to Medicare/United Behavioral Health and United Behavioral Health dual SNP on or after June 21, 2021, and were paid by Medicare/United Behavioral Health and United Behavioral Health dual SNP for services allegedly provided to patient E.

f.     Patient F was admitted to The Willough at Naples on June 18, 2021, and discharged on or about July 2, 2021. Defendants submitted claims for payment for patient F's care to Medicare on or after July 2,

48

2021, and were paid by Medicare for services allegedly provided to patient F.

g.      Patient G was admitted to The Willough at Naples on June 21, 2021, and discharged on or about June 29, 2021.   Defendants submitted claims for payment for patient G's care to Medicare on or after June 29, 2021, and were paid by Medicare for services allegedly provided to patient G.

h.      Patient H was admitted to The Willough at Naples on June 25, 2021, and discharged on or about July 1, 2021.  Defendants submitted claims for payment for patient H's care to Humana Medicare and Florida Medicaid on or after July 1, 2021, and were paid by Humana Medicare and Florida Medicaid for services allegedly provided to patient H.

i.      Patient I was admitted to The Willough at Naples on June 30, 2021, and discharged on or about July 9, 2021.  Defendants submitted claims for payment for patient I's care to Staywell on or after July 9, 2021, and were paid by Staywell for services allegedly provided to patient I.

j.      Patient J was admitted to The Willough at Naples on July 7, 2021, and discharged on or about July 22, 2021.  Defendants submitted claims for payment for patient J's care to Medicare and United Behavioral Health on or after July 22, 2021, and were paid by Medicare

and United Behavioral Health for services allegedly provided to patient J.

k.    Patient K was admitted to The Willough at Naples on July 8, 2021, and discharged on or about July 16, 2021. Defendants submitted claims for payment for patient K's care to Wellcare Medicare and Wellcare dual SNP on or after July 16, 2021, and were paid by Wellcare Medicare and Wellcare dual SNP for services allegedly provided to patient K.

l.    Patient L was admitted to The Willough at Naples on July 22, 2021, and discharged on or about August 2, 2021. Defendants submitted claims for payment for patient L's care to Staywell on or after August 2, 2021, and were paid by Staywell for services allegedly provided to patient L.

m.    Patient M was admitted to The Willough at Naples on July 26, 2021, and discharged on or about August 23, 2021. Defendants submitted claims for payment for patient M's care to Medicare on or after August 23, 2021, and were paid by Medicare for services allegedly provided to patient M.

n.    Patient N was admitted to The Willough at Naples on August 13, 2021, and discharged on or about August 20, 2021. Defendants submitted claims for payment for patient N's care to

50

Wellcare and Wellcare dual SNP on or after August 20, 2021, and were paid by Wellcare and Wellcare dual SNP for services allegedly provided to patient N.

o.     Patient O was admitted to The Willough at Naples on August 25, 2021, and discharged on or about August 27. 2021. Defendants submitted claims for payment for patient O's care to Medicare on or after August 27, 2021, and were paid by Medicare for services allegedly provided to patient O.

135.   As a result of these knowingly false claims submissions, Defendants were paid by Medicare, Medicaid, and Medicare Part C for services tainted by kickbacks.

### C.     Defendants Knowingly Provide Worthless Services, Fail To Maintain Medical Records, And Instruct Employees To Falsify Medical Records

136.   Defendants knowingly provide worthless services and knowingly fail to ensure that patients' medical records contain documentation evidencing the provision of reasonable and medically necessary patient services, violating Medicare and Florida Medicaid requirements. In fact, Defendants' medical records reveal that services are either not provided or of such substandard value as to be worthless.

137.   Defendants knowingly fail to comply with both Medicare's special provisions applying to psychiatric hospitals and Florida Medicaid's

51

requirements that medical records document the reasonableness and medical necessity of services provided. Most charts are missing medical, nursing, and/or psychological care notes. These medical records are missing because patients do not receive the care to which they are entitled and for which payment is made by Medicare and Medicaid.

138. Relator Treloar witnessed false documentation of suicide precautions, which are checks to be performed every fifteen minutes on all detoxifying patients over a twenty-four-hour period. Relator Treloar witnessed behavioral health aides sitting at nursing stations, not checking on patients, and entering notes in charts as if services had occurred.

139. Relator Treloar witnessed staff providing substandard and worthless services, both by recklessly failing to provide services and/or by Defendants' recklessly insufficient staffing of the facilities, resulting in staff members being incapable of providing sufficient services. Most shifts have one behavioral health aide and one registered nurse providing services to thirty to forty patients, and the registered nurse must also distribute medications to those patients throughout the shift, leaving the nurse unable to provide patient care.

140. Defendants' recklessly inadequate staffing results in patients being warehoused in the facilities without adequate medical care, counseling, social services, or other support necessary to address patients' needs.

141.   As a result of the reckless lack of staffing and services, adequate medical records are not created because reasonable and medically necessary healthcare does not occur.  To hide their substandard and worthless services, Defendants knowingly instruct employees to falsify medical records, making it appear that unprovided services were actually rendered.  *See supra* ¶¶130-131; *infra* Section VI.C.1.

142.   Relator Treloar discussed her concerns regarding worthless medical care and substandard medical records with her supervisor Debbie Pickles ("Pickles"), and with Oglethorpe administrator Rick Bennett ("Bennett").  Relator Treloar also created a list of the problems she witnessed, noting the fraud risks associated with not resolving the issues.  *See* Relator Treloar's list, attached hereto as Exhibit A.  Relator Treloar gave a copy of the list to Pickles, Human Resources, and Bennett but Defendants did nothing in response to Relator Treloar's complaints.

143.   Bennett, also known as a "fixer" at Oglethorpe, travels between Oglethorpe facilities to resolve problems.  Relator Treloar discussed her concerns regarding inadequate medical care and missing medical record documentation with Bennett.  Relator Treloar told Bennett that she could provide The Willough at Naples with quality assurance services to ensure that reasonable and necessary services were provided and were properly documented before patient discharge.  Bennett told Relator Treloar that

53

those services were not needed, as he intended to "clean house" and fire most of The Willough at Naples employees.

144. Several months after this conversation, the only changes Bennett made at The Willough at Naples were to the physical building. Knowingly worthless medical care remained pervasive, and knowingly insufficient medical record documentation continued. Relator Treloar's complaints made no impact; Defendants were unwilling to hire more staff or train staff in appropriate documentation requirements.

145. Relator Skinner also noted and frequently complained of the recklessly inadequate staffing at defendant Oglethorpe's facilities.

146. For example, when defendant Oglethorpe hired Relator Skinner, she learned that for several years defendant Oglethorpe had not had physician or medical director overseeing the diagnosis and treatment of patients at Georgetown Behavioral Hospital in Georgetown, Ohio.

147. Instead, Oglethorpe maintained a staff of nurse practitioners to oversee the medical care at Georgetown Behavioral Hospital. To conceal this insufficient staffing and to obtain payment from the United States, defendant Oglethorpe listed a physician from another facility (who rarely visited Georgetown Behavioral Hospital and provided no oversight) as the medical director and required him to sign off on any required physician documents.

54

148.    Additionally, Georgetown Behavioral Hospital did not have the required director of social services.  Despite not having required personnel in these positions, defendant Oglethorpe admitted psychiatric patients and billed Medicare and Medicaid for the deficient treatment of those patients.

### 1.    Management Direct Staff To Fabricate Medical Documentation

149.    Defendants' employees store closed charts at each facility.  At The Willough at Naples, closed charts are stored in the basement.  Staff members like Relator are directed to review the closed charts, determine what documentation is missing, then place color coded Post-It flags on the charts where documentation is missing.  The color of the Post-It flag indicates what type of documentation is missing, i.e., medical, nursing, and/or psychological therapy.  *See* picture of charts with Post-It flags attached hereto as Exhibit B.

150.    The Willough at Naples' Health Information Management Director Tiffany Crawford ("Crawford") directs staff to review charts and ensure that all medical records include a patient history and physical documented within forty-eight hours of admission, and a discharge aftercare form that includes a list of discharge medications.  Crawford informs staff and providers that "newly created entries," i.e., false documentation entered after patient discharges, must be signed with the time and date that the false

55

entry should initially have been entered.  *See* Crawford Memo attached hereto as Exhibit C.

151.   After reviewing charts and placing Post-It flags, nurses place the charts on metal shelving units marked to indicate which doctor, nurse, or therapist needs to review the chart and fabricate missing documentation. *See* picture of shelving units with provider names, indicating the provider who failed to document patient care and must now falsely document patient care in the chart attached hereto as Exhibit D.

152.   Nursing employees are similarly required, often by the Director of Nursing, a charge nurse, or during a charting party, to identify missing nursing notes then falsely document that reasonable and necessary care occurred.  Nurses are instructed, often weeks or months after discharge, to document care as if the note had been created during the inpatient period. Nurses are directed to make these false entries regardless of whether they even knew or cared for the patient.

153.   In June 2021, a charge nurse assigned Relator Treloar to work full time reviewing charts, instructing Relator Treloar to place Post-It notes and falsely write nursing progress notes, making it appear as if patient care had been provided and timely documented.

154.   On September 11, 2021, Relator Treloar reviewed patient P's chart.  Patient P was admitted on July 20, 2020.  Based upon a suicide

56

screening assessment form, patient P had a moderate (eight out of ten risk score) suicide risk. When a suicide assessment shows that a patient is at increased suicide risk, staff must notify the patient's physician using a pre-printed facility form. This form then triggers the physician to order suicide precautions. Staff failed to notify patient P's physician that patient P was at increased suicide risk with an eight of out ten suicide risk score.

155. Relator Treloar was directed to create a suicide physician notification note to "report" patient P's July 2020 suicide risk score. Relator Treloar created the suicide physician notification note as instructed, and dated it July 20, 2021, even though patient P's hospitalization occurred in 2020.

156. Defendants knowingly and regularly instruct nurses to falsely insert new nursing progress notes into charts. Relator Treloar is aware that this practice is common and long-standing because management directed her to falsely document patient care, and Relator Treloar witnessed other nurses performing this task.

157. This practice occurred frequently at The Willough at Naples. For example:

    a.    Patient Q, a Medicare beneficiary, was admitted on June 16, 2021, and discharged on June 26, 2021. Post-discharge, patient Q's medical record did not contain, among other things, a nursing progress

57

admission note from June 18, 2021.  Post-discharge, Relator Treloar wrote the progress note, as instructed, on patient Q's chart, dating the note, as instructed, as if it had been written on June 18, 2021.  The note stated that the newly admitted patient was receiving, as required by the detox protocol, safety checks every fifteen minutes.  Relator Treloar could not verify the accuracy of this statement.  Nevertheless, based upon such falsified records, Defendants submitted claims for payment for services provided to patient Q after June 26, 2021, and were paid by Medicare.

b.    At discharge, nurses are required to assess a patient's suicide ideation severity risk, using a preprinted scale.  This evaluation occurs to determine if the patient can be safely discharged or may be at risk of harming herself or himself.  For patient R, a Medicare and Staywell Medicaid beneficiary admitted to the psychiatry program on July 19, 2021, and discharged on July 21, 2021, this discharge evaluation did not occur.  Relator Treloar completed the discharge assessment form, as instructed, and dated it as if the assessment had occurred at the time of discharge.  Defendants' failure to assess for suicide ideation before discharge is a gross safety violation.  Nevertheless, based upon such falsified records, Defendants submitted claims for payment on or after July 21 2021 to Medicare and Staywell

58

Medicaid for patient R's services, and were paid by Medicare and Staywell Medicaid.

c.      On July 8, 2021, patient J was ordered to be placed on one-on-one care as a suicide precaution.  The nursing notes from that date, however, failed to document whether patient J actually received one-on-one care that day.  After discharge, Relator Treloar was instructed to falsely create nursing notes indicating that one-on-one care had been provided that day.  She was also instructed to enter another note for care allegedly delivered to patient J on July 17, 2021.  Patient J did not receive reasonable and necessary care.  Nevertheless, based upon such falsified records, Defendants submitted claims for payment on or after July 17, 2021 to Medicare for patient J's services, and were paid by Medicare.

d.      Patient S, a Blue Cross Blue Shield beneficiary, was admitted on June 1, 2021, to the detox/dual diagnosis program and discharged on June 9, 2021. As of September, 2021, patient S's nursing admission assessment, among other things, had not been documented.

158.   Relator Treloar was present when staff at one of defendant Oglethorpe's sister facilities called The Willough at Naples because Medicare or Medicaid auditors were conducting surprise audits at the other facilities. The Willough at Naples similarly calls defendant Oglethorpe's sister facilities

to warn that Medicare and Medicaid auditors are conducting surprise audits at The Willough at Naples. These warning calls occur for the sister facilities to "warn" each other that auditors are likely on their way.

159. Warning calls from the sister facilities give Defendants' staff sufficient time to "prepare" patient medical records for a potential audit. When a warning call occurs, The Willough at Naples staff cease patient care and gather large numbers of charts for a "charting party," adding any documentation necessary to complete the deficient charts.

160. Nonexistent care, falsely documented, constitutes worthless services. Defendants knowingly submit false claims to Medicare and Medicaid for these worthless services.

161. Medicare and Medicaid pay Defendants in reliance on the truthfulness of these knowingly false claims.

### D. Defendants Knowingly Bill Medicare And Medicaid For Patients Admitted And Retained Without The Medical Necessity To Justify Their Treatment

162. As noted above, Medicare and Medicaid patients admitted to IPFs must be under the care of a physician, who must initially certify and regularly re-certify the medical necessity for the patient's inpatient psychiatric hospitalization.

163. To justify inpatient hospitalization, patients must require intensive, multimodal treatment at levels of intensity and frequency that they cannot receive in an outpatient setting.

164. During her employment, Relator Skinner learned that defendant Oglethorpe places enormous pressure on its hospital directors and employees to keep census numbers at each of its locations high.

165. As a result, Relator Skinner witnessed how defendant Oglethorpe routinely admitted patients lacking the medical necessity necessary to justify billing Medicare and Medicaid, and routinely kept patients admitted and continued to bill for their treatment far longer than justified.

166. Much of defendant Oglethorpe's push to increase its census came from Tracy, who during Relator Skinner and Relator Snook's employment with defendant Oglethorpe served at its Corporate Director of Operations. In addition to working at The Willough at Naples, Tracy also directed a company call center, from which he pushed admissions nationwide to all of defendant Oglethorpe's facilities, regardless of the patient's medical necessity for admission.

167. That call center was staffed to take calls from across the country on nights and weekends. And when individuals would call in, Tracy had procedures in place to transport those patients to one of defendant

61

Oglethorpe's facilities (often from great distances) in taxis or rideshare services like Uber or Lyft.

168. Once the patient arrived at one of defendant Oglethorpe's facilities, the staff was expected to admit the patient and to bill Medicare or Medicaid without regard to the medical necessity of admission or the patient's satisfaction of other criteria.

169. For example, during her employment, Relator Skinner learned of a patient that refused to pay a required co-pay. When Relator Skinner sought to enforce the requirement, Tracy grew irate and pushed to improperly admit and bill for the patient.

170. Additionally, once defendant Oglethorpe admitted a Medicare or Medicaid patient, the staff members were pressured to keep the patients admitted as long as possible to maximize the reimbursement. Defendant Oglethorpe routinely kept patients admitted long after the medical necessity for inpatient care was necessary or appropriate.

171. In their executive roles, Relator Skinner and Relator Snook each had first-hand experience dealing with issues created by Oglethorpe's admission and retention of Medicare and Medicaid patients that did not have the required medical necessity.

172. For example, the CEO of The Willow at Naples contacted Relator Skinner and defendant Oglethorpe's Director of Compliance and raised

62

concerns about defendant Oglethorpe's practice of manipulating charts and documents so that it would appear that Medicare and Medicaid patients that either never should have been admitted, or were ready for discharge, could in fact be or remain admitted.

173.   Similarly, Relator Snook hired an individual to serve as the Director of Case Management at The Blackberry Center in St. Cloud, Florida. Almost immediately after her hire, that employee contacted Relator Snook very concerned about Tracy and his admission and retention of Medicare and Medicaid patients that did not have the medical necessity to justify payment from government payors.

174.   The Director of Case Management also raised these issues with Relator Skinner and defendant Oglethorpe's Director of Compliance, but Oglethorpe did nothing to correct those issues or to prevent improper requests for payment from government payors.

## E.   Defendant Oglethorpe Knowingly Violates The Terms Of Its CIA And Knowingly Fails To Repay Money Owed To The United States

175.   As noted above, in January 2021, defendant Oglethorpe entered into a CIA with HHS.  That CIA resulted from previous allegations that defendant Oglethorpe violated the FCA and served to promote its compliance with Medicare and Medicaid statutes and regulations, and written directives.

176. As part of the CIA, defendant Oglethorpe was required to develop and implement policies and procedures regarding the identification and repayment of any overpayments received from any federal health care program.

177. The CIA included stipulated penalties for certain violations, including a stipulated penalty of $1,000 per day for each day that defendant Oglethorpe failed to fully comply with the CIA.

178. At all times while Relator Skinner and Relator Snook worked as defendant Oglethorpe's executives, defendant Oglethorpe was subject to the terms and conditions set forth in the CIA.

179. And during their employment, Relator Skinner and Relator Snook each identified and reported to defendant Oglethorpe's executive team multiple issues that would have resulted in overpayments and triggered defendant Oglethorpe's obligation to report and repay overpayments and to pay stipulated fines to HHS.

180. Defendant Oglethorpe, however, did not comply with the terms of the CIA and never disclosed any overpayments or paid any stipulated fines to HHS. Nor did defendant Oglethorpe take any steps to end the behavior that had resulted in the imposition of the CIA.

## VII.  DAMAGES CAUSED BY DEFENDANTS' FALSE CLAIMS

181.  Defendants' continuous and systematic wrongful scheme of submitting claims to Medicare and Medicaid for payment, based on false and/or fraudulent underlying certifications, caused the United States and Florida  significant damages.

182.  Based upon information and belief, it is alleged that during the time period of 2016 to the present, the Defendants, consistent with the allegations contained herein, billed Medicare and Medicaid and was paid at least approximately $60 million.  Upon information and belief, it is alleged that about 50% or more, of that amount, was wrongfully obtained from Medicare and Medicaid, by Defendants, as a result of the Defendants' wrongful conduct as alleged herein.

183.  *Moreover*, Defendants' alleged breach of the CIA, by causing false certifications to be submitted to the federal government in the context of the CIA, is an additional harm to the federal government that should be remedied.

## VIII. COUNTS

### COUNT I
### Federal False Claims Act
### 31 U.S.C. §3729(a)(1)(A)

184.  Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

65

185. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§3729, *et seq.*, as amended.

186. By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. §3729(a)(1)(A).

187. The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims submitted for payment, paid, or authorized payment of those claims that would not otherwise be paid but for Defendants' unlawful conduct.

188. As a result of Defendants' acts, the United States has been damaged, in a substantial amount to be proven at trial.

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. §3729(a)(1)(B)**

189. Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

190. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§3729, *et seq.*, as amended.

191. By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement material to a false or fraudulent claim" in violation of 31 U.S.C. §3729(a)(1)(B).

66

192. The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims submitted for payment, paid, or authorized payment of those claims that would not otherwise be paid but for Defendants' unlawful conduct.

193. As a result of Defendants' acts, the United States has been damaged, in a substantial amount to be proven at trial.

## COUNT III
### Federal False Claims Act
### 31 U.S.C. §3729(a)(1)(G)

194. Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

195. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§3729, *et seq.*, as amended.

196. By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ed] or knowingly and improperly [avoided] or decreas[ed] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. §3729(a)(1)(G).

197. The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims submitted for

67

payment, paid, or authorized payment of those claims that would not otherwise be paid but for Defendants' unlawful conduct.

198.  As a result of Defendants' acts, the United States has been damaged, in a substantial amount to be proven at trial.

**COUNT IV**
**Florida False Claims Act**
**Fla. Stat. §68.082(2)(a)**

199.  Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

200.  By virtue of the acts described above, Defendants have "knowingly present[ed] or cause[d] to be presented a false or fraudulent claim for payment or approval" to the Florida Medicaid program.

201.  Florida, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims submitted for payment or approval, paid, or authorized payment, or approved or authorized approval of those claims and has been damaged in an amount to be proven at trial.

**COUNT V**
**Florida False Claims Act**
**Fla. Stat. §68.082(2)(b)**

202.  Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

203.  By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or

68

statement that was material to false or fraudulent claims" in violation of §68.082(2)(b) of the Florida Statutes.

204.   Florida, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims submitted for payment or approval, paid, or authorized payment, or approved or authorized approval of those claims and has been damaged in an amount to be proven at trial.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Relators demand that judgment be entered in favor of the United States and Florida, and against Defendants, for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

This includes, with respect to the FCA, three times the amount of damages to the United States plus civil penalties of no more than $27,018 and no less than $13,508 for each violation occurring after January 30, 2023. 31 U.S.C. §3729(a); 28 C.F.R. §85.5.   Relators also demand any other recoveries or relief provided for under the FCA.

This includes, with respect to the Florida FCA, three times the amount of damages to Florida plus civil penalties of no more than $11,000 and no less than $5,500 for each violation.   Relators also demand any other recoveries or relief provided for under the Florida FCA.

69

Further, Relators request that they receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

Further, Relators request that they receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by Florida, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## X. DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: August 25, 2025                    Respectfully submitted,

                                          */s/ Scott Terry*
                                          Scott Terry
                                          Florin Gray
                                          16524 Pointe Village Dr., Ste. 100
                                          Lutz, FL 33558
                                          (727) 220-4000
                                          sterry@floringray.com

70

*Attorneys for Relators Jeannette Skinner and Joel Snook*

/s/ Scott Terry
Scott Terry
Florin Gray
16524 Pointe Village Dr., Ste. 100
Lutz, FL 33558
(727) 220-4000
sterry@floringray.com

Regina D. Poserina *
Costello & Silverman
18000 Horizon Way, Suite 800
Mount Laurel, NJ 08054
(856) 727-9700
rposerina@costellosilverman.com
*Attorneys for Relator Whitney Treloar*

/s/ Dana M. Gallup
Dana M. Gallup
(FL Bar No. 0949329)
Gallup Auerbach
4000 Hollywood Boulevard
Suite 265 South
Hollywood, FL 33021
(954) 894-3035
dgallup-law@galluplaw.com

Brian J. Robbins*
Kevin A. Seely*
Robbins LLP
5060 Shoreham Place, Suite 300
San Diego, CA 92122
(619) 525-3990
brobbins@robbinsllp.com
kseely@robbinsllp.com
*Attorneys for Relator Darren Caruso*

* *To be admitted Pro Hac Vice*

71

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 25, 2025, I caused a true and accurate copy of the First Amended Complaint Filed In Camera And Under Seal Pursuant To The False Claims Act, 31 U.S.C. §3729, *Et Seq.*, And The Florida False Claims Act, Fla. Stat. §68.081, *Et Seq.* to be served via certified U.S. Mail, postage prepaid, return receipt requested, upon the following:

The Honorable Pamela Bondi
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

The Honorable Gregroy W. Kehoe
U.S. Attorney for the Middle District
    Of Florida
U.S. Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, FL 33602

The Honorable James Uthmeier
Attorney General of the State of
Florida
Office of the Attorney General
The Capitol PL-01
Tallahassee, FL 32999-1050

The Honorable Jimmy Patronis
Chief Financial Officer
Florida Department of Financial
Services
200 East Gaines Street
Tallahassee, FL 32399

Clerk of the Court
United States District Court for
The Middle District of Florida
207 Northwest Second Street
Ocala, FL 34475

Dated:  August 25, 2025

*/s/Scott Terry*
    Scott Terry, Esq.

72